IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel.<br>Maros KMEC, | |
| Plaintiffs, | Civil No. _1:19cv660_<br>_CMH / IDD_ |
| v. | |
| AIRBUS DEFENSE AND SPACE, INC.,<br>AIRBUS GROUP INC.,<br>AIRBUS DEFENCE AND SPACE, SA,<br>AIRBUS DEFENSE AND SPACE<br>    MILITARY AIRCRAFT, SA,<br>AIRBUS HELICOPTERS, INC.,<br>AIRBUS DEFENSE AND SPACE MILITARY<br>    AIRCRAFT, INC.,<br>AIRBUS SECURE LAND<br>    COMMUNICATIONS, and<br>AIRBUS DEFENCE AND SPACE GMBH, | Jury Trial Demanded<br><br><br>**FILED UNDER SEAL** |
| Defendants. | |

## COMPLAINT

Benjamin J. Vernia*
D.C. Bar No. 441287
Andrew K. Murray
D.C. Bar No. 187281
THE VERNIA LAW FIRM
1455 Pennsylvania Ave., N.W.,
Suite 400
Washington, D.C. 20004
Tel. (202) 349-4053
Fax (866) 572-6728
bvernia@vernialaw.com

*pro hac vice motion to be filed*

Timothy R. Clinton
Va. Bar. No. 70902
CLINTON & PEED
777 6th Street NW, 11th Fl.
Washington, DC 20001
(202) 621-1828
(202) 204-6320 (fax)
tim@clintonpeed.com

*Counsel for Relator and Plaintiff
Maros Kmec*

Plaintiff and Relator, Maros Kmec (Kmec), on behalf of the United States of America

(the "Government") and himself, brings this action under the Federal False Claims Act, 31

U.S.C. § 3729, *et seq.*, against Airbus Defense and Space, Inc. (ADSI), Airbus Group, Inc.,
Airbus Defence and Space, SA, Airbus Defense and Space Military Aircraft, SA, Airbus
Helicopters, Inc., Airbus Defense and Space Military Aircraft, Inc., Airbus Secure Land
Communications, and Airbus Defence and Space GmbH, to recover all damages, penalties, and
other remedies provided by the False Claims Act on behalf of the United States and himself, and
for his Complaint alleges:

## I.   Parties

1.      Plaintiff and Relator Maros Kmec began working at ADSI in March 2015. He was
employed at the company's offices, located at 2550 Wasser Terrace, Suite #9000, Herndon,
Virginia 20171. Until his departure, Mr. Kmec worked as a Contracts Manager with
responsibility for managing a large portfolio of contracts as described in more detail below.

2.      Defendant ADSI is a foreign-owned for-profit corporation, incorporated in
Delaware, but registered with the Commonwealth of Virginia and authorized to operate a
business therein. ADSI is a subsidiary of Airbus Group, Inc. (itself a subsidiary of Airbus SE)
operating in North America.

3.      Defendant Airbus Defence and Space, SA, is an ADSI affiliate based in Madrid,
Spain. It is a subsidiary of Airbus Group SE.

4.      Defendant Airbus Defense and Space Military Aircraft, SA, is an ADSI affiliate
based in Seville, Spain. It is also a subsidiary of Airbus Group SE.

5.      Defendant Airbus Helicopters, Inc. is an ADSI affiliate based in Grand Prairie,
Texas. It is also a subsidiary of Airbus Group Inc.

6.      Defendant Airbus Defense and Space Military Aircraft, Inc. (ADSMA) is an
ADSI affiliate operating in Mobile, Alabama. It is a subsidiary of Airbus SE.

7.     Defendant Airbus Secure Land Communications (Airbus SLC) is a European subsidiary of Airbus Defence and Space, which is itself a subsidiary of Airbus SE.

8.     Defendant Airbus Defence and Space GmbH (Airbus DS GmbH) is based in Ottobrunn, Germany and is a subsidiary of Airbus SE.

## II.    Jurisdiction and Venue

9.     Jurisdiction in this Court is proper pursuant to 31 U.S.C. § 3732(a) and 3730(b). This Court also has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1345.

10.     The Court may exercise personal jurisdiction over the Defendants, and venue is proper in this Court pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391 because the acts proscribed by 31 U.S.C. § 3729 *et seq.*, and complained of herein took place in part in this district and the Defendants transacted business in this District:

> a.   At all times relevant to this Complaint, ADSI has maintained offices in this District, in Fairfax County.

> b.   As discussed below, ADSI committed violations of 31 U.S.C. § 3729 *et seq*. These violations occurred in the Eastern District of Virginia, among other locations.

Pursuant to 31 U.S.C. § 3730(b)(2), the Relator has prepared and served (along with the original Complaint) on the Attorney General of the United States, and the United States Attorney for the Eastern District of Virginia a statement of all material evidence and information currently in his possession and of which he is the original source. This Disclosure Statement is supported by material evidence known to the Relator at the time of filing establishing the existence of Defendants' false and fraudulent claims. Because the Disclosure Statement includes attorney-

client communications and work product of Relator's attorneys and was submitted to Federal officials in their capacity as counsel for the United States, the real-party-in-interest in the action's qui tam allegations, the Relator asserts that the Disclosure Statement is confidential and exempt from disclosure under the Freedom of Information Act (*see* 5 U.S.C. § 552; 31 U.S.C. § 3729(c)) and common-law doctrines of common interest privilege and work-product.

### III.   Legal Background

### The False Claims Act

11.   The False Claims Act provides, in pertinent part:

(a) Liability for certain acts. –

(1) In general. – Subject to paragraph (2), any person who –

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

(D) has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property;

(E) is authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true;

(F) knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge property; or

4

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410 [*see* ¶ 12, below]), plus 3 times the amount of damages which the Government sustains because of the act of that person.

(b) Definitions. – For purposes of this section –

(1) the terms "knowing" and "knowingly" –

(A) mean that a person, with respect to information –

(i) has actual knowledge of the information;

(ii) acts in deliberate ignorance of the truth or falsity of the information; or

(iii) acts in reckless disregard of the truth or falsity of the information; and

(B) require no proof of specific intent to defraud;

(2) the term "claim" –

(A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that –

(i) is presented to an officer, employee, or agent of the United States; or

(ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government –

(I) provides or has provided any portion of the money or property requested or demanded; or

(II) will reimburse such contractor, grantee, or other recipient for any portion of the money or·property which is requested or demanded; and

(B) does not include requests or demands for money or property that the Government has paid to an individual as compensation for Federal employment or as an income subsidy with no restrictions on that individual's use of the money or property;

(3) the term "obligation" means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment; and

(4) the term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.

31 U.S.C. § 3729(a), (b).

**Relief from retaliatory actions.**

(1) In general. – Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

(2) Relief. – Relief under paragraph (1) shall include reinstatement with the same seniority status that employee, contractor, or agent would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees. An action under this subsection may be brought in the appropriate district court of the United States for the relief provided in this subsection.

(3) Limitation on bringing civil action. – A civil action under this subsection may not be brought more than 3 years after the date when the retaliation occurred.

31 U.S.C. § 3730(h).

12.     Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as

amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), the

Bipartisan Budget Act of 2015, Pub. L. 114-74, § 701 (Nov. 2, 2015), and 28 C.F.R. § 85.1, *et seq.*, the False Claims Act civil penalties were adjusted to $11,181 to $22,363 for violations assessed after January 29, 2018. 28 C.F.R. § 85.5 (2018).

### Federal Acquisition Regulation (FAR)

13.     The Federal Acquisition Regulation provides, in pertinent part:

**Determining allowability.**

(a) A cost is allowable only when the cost complies with all of the following requirements:

(1) Reasonableness.

(2) Allocability.

(3) Standards promulgated by the CAS Board, if applicable, otherwise, generally accepted accounting principles and practices appropriate to the circumstances.

(4) Terms of the contract.

(5) Any limitations set forth in this subpart.

(b) Certain cost principles in this subpart incorporate the measurement, assignment, and allocability rules of selected CAS and limit the allowability of costs to the amounts determined using the criteria in those selected standards. Only those CAS or portions of standards specifically made applicable by the cost principles in this subpart are mandatory unless the contract is CAS-covered (see part 30). Business units that are not otherwise subject to these standards under a CAS clause are subject to the selected standards only for the purpose of determining allowability of costs on Government contracts. Including the selected standards in the cost principles does not subject the business unit to any other CAS rules and regulations. The applicability of the CAS rules and regulations is determined by the CAS clause, if any, in the contract and the requirements of the standards themselves.

(c) When contractor accounting practices are inconsistent with this subpart 31.2, costs resulting from such inconsistent practices in excess of the amount that would have resulted from using practices consistent with this subpart are unallowable.

(d) A contractor is responsible for accounting for costs appropriately and for maintaining records, including supporting documentation, adequate to demonstrate that costs claimed have been incurred, are allocable to the contract, and comply with applicable cost principles in this subpart and agency supplements. The contracting officer may disallow all or part of a claimed cost that is inadequately supported.

FAR 31.201-2.

**Direct costs.**

(a) No final cost objective shall have allocated to it as a direct cost any cost, if other costs incurred for the same purpose in like circumstances have been included in any indirect cost pool to be allocated to that or any other final cost objective. Direct costs of the contract shall be charged directly to the contract. All costs specifically identified with other final cost objectives of the contractor are direct costs of those cost objectives and are not to be charged to the contract directly or indirectly.

(b) For reasons of practicality, the contractor may treat any direct cost of a minor dollar amount as an indirect cost if the accounting treatment –

(1) Is consistently applied to all final cost objectives; and

(2) Produces substantially the same results as treating the cost as a direct cost.

FAR 31.202.

**Indirect costs.**

(a) For contracts subject to full CAS coverage, allocation of indirect costs shall be based on the applicable provisions. For all other contracts, the applicable CAS provisions in paragraphs (b) through (h) of this section apply.

(b) After direct costs have been determined and charged directly to the contract or other work, indirect costs are those remaining to be allocated to intermediate or two or more final cost objectives. No final cost objective shall have allocated to it as an indirect cost any cost, if other costs incurred for the same purpose, in like circumstances, have been included as a direct cost of that or any other final cost objective.

(c)  contractor shall accumulate indirect costs by logical cost groupings with due consideration of the reasons for incurring such costs. The contractor shall determine each grouping so as to permit use of an allocation base that is common to all cost objectives to which the grouping is to be allocated. The base selected

shall allocate the grouping on the basis of the benefits accruing to intermediate and final cost objectives. When substantially the same results can be achieved through less precise methods, the number and composition of cost groupings should be governed by practical considerations and should not unduly complicate the allocation.

(d) Once an appropriate base of allocating indirect costs has been accepted, the contractor shall not fragment the base by removing individual elements. All items properly includable in an indirect cost base shall bear a pro rata share of indirect costs irrespective of their acceptance as Government contract costs. For example, when a cost input base is used for the allocation of G&A costs, the contractor shall include in the base all items that would properly be part of the cost input base, whether allowable or unallowable, and these items shall bear their pro rata share of G&A costs.

(e) The method of allocating indirect costs may require revision where there is a significant change in the nature of the business, the extent of subcontracting, fixed-asset improvement programs, inventories, the volume of sales and production, manufacturing processes, the contractor's products, or other relevant circumstances.

FAR 31.203(a)-(e)

**Selected Costs. Contingencies.**

(a) "Contingency," as used in this subpart, means a possible future event or condition arising from presently known or unknown causes, the outcome of which is indeterminable at the present time.

(b) Costs for contingencies are generally unallowable for historical costing purposes because such costing deals with costs incurred and recorded on the contractor's books. However, in some cases, as for example, terminations, a contingency factor may be recognized when it is applicable to a past period to give recognition to minor unsettled factors in the interest of expediting settlement.

(c) In connection with estimates of future costs, contingencies fall into two categories:

(1) Those that may arise from presently known and existing conditions, the effects of which are foreseeable within reasonable limits of accuracy; e.g., anticipated costs of rejects and defective work. Contingencies of this category are to be included in the estimates of future costs so as to provide the best estimate of performance cost.

(2) Those that may arise from presently known or unknown conditions, the effect of which cannot be measured so precisely as to provide equitable

results to the contractor and to the Government; e.g., results of pending litigation. Contingencies of this category are to be excluded from cost estimates under the several items of cost, but should be disclosed separately (including the basis upon which the contingency is computed) to facilitate the negotiation of appropriate contractual coverage. (See, for example, 31.205-6(g) and 31.205-19.)

FAR 31.205-7.

14.     FAR incorporates certain Cost Accounting Standards (CAS) to address cost allocation in Government contracting.

CAS 401 is incorporated at FAR 31.201-1 and FAR 31.203. CAS 402 is incorporated at FAR 31.202 and FAR 31.203.

**Composition of Total Cost.**

(a) The total cost, including standard costs properly adjusted for applicable variances, of a contract is the sum of the direct and indirect costs allocable to the contract, incurred or to be incurred, plus any allocable cost of money pursuant to 31.205-10, less any allocable credits. In ascertaining what constitutes a cost, any generally accepted method of determining or estimating costs that is equitable and is consistently applied may be used.

(b) While the total cost of a contract includes all costs properly allocable to the contract, the allowable costs to the Government are limited to those allocable costs which are allowable pursuant to Part 31 and applicable agency supplements.

FAR 31.201-1.

**Indirect Costs.**

(a) For contracts subject to full CAS coverage, allocation of indirect costs shall be based on the applicable provisions. For all other contracts, the applicable CAS provisions in paragraphs (b) through (h) of this section apply.

(b) After direct costs have been determined and charged directly to the contract or other work, indirect costs are those remaining to be allocated to intermediate or two or more final cost objectives. No final cost objective shall have allocated to it as an indirect cost any cost, if other costs incurred for the same purpose, in like circumstances, have been included as a direct cost of that or any other final cost objective.

10

(c) The contractor shall accumulate indirect costs by logical cost groupings with due consideration of the reasons for incurring such costs. The contractor shall determine each grouping so as to permit use of an allocation base that is common to all cost objectives to which the grouping is to be allocated. The base selected shall allocate the grouping on the basis of the benefits accruing to intermediate and final cost objectives. When substantially the same results can be achieved through less precise methods, the number and composition of cost groupings should be governed by practical considerations and should not unduly complicate the allocation.

(d) Once an appropriate base for allocating indirect costs has been accepted, the contractor shall not fragment the base by removing individual elements. All items properly includable in an indirect cost base shall bear a pro rata share of indirect costs irrespective of their acceptance as Government contract costs. For example, when a cost input base is used for the allocation of G&A costs, the contractor shall include in the base all items that would properly be part of the cost input base, whether allowable or unallowable, and these items shall bear their pro rata share of G&A costs.

(e) The method of allocating indirect costs may require revision when there is a significant change in the nature of the business, the extent of subcontracting, fixed-asset improvement programs, inventories, the volume of sales and production, manufacturing processes, the contractor's products, or other relevant circumstances.

(f) Separate cost groupings for costs allocable to offsite locations may be necessary to permit equitable distribution of costs on the basis of the benefits accruing to the several cost objectives.

(g) A base period for allocating indirect costs is the cost accounting period during which such costs are incurred and accumulated for allocation to work performed in that period.

(1) For contracts subject to full or modified CAS coverage, the contractor shall follow the criteria and guidance in 48 CFR 9904.406 for selecting the cost accounting periods to be used in allocating indirect costs.

(2) For contracts other than those subject to paragraph (g)(1) of this section, the base period for allocating indirect costs shall be the contractor's fiscal year used for financial reporting purposes in accordance with generally accepted accounting principles. The fiscal year will normally be 12 months, but a different period may be appropriate (e.g., when a change in fiscal year occurs due to a business combination or other circumstances).

11

(h) Special care should be exercised in applying the principles of paragraphs (c), (d), and (e) of this section when Government-owned contractor-operated (GOCO) plants are involved. The distribution of corporate, division or branch office G&A expenses to such plants operating with little or no dependence on corporate administrative activities may require more precise cost groupings, detailed accounts screening, and carefully developed distribution bases.

(i) Indirect costs that meet the definition of "excessive pass-through charge" in 52.215-23, are unallowable.

FAR 31.203.

**Direct Costs.**

(a) No final cost objective shall have allocated to it as a direct cost any cost, if other costs incurred for the same purpose in like circumstances have been included in any indirect cost pool to be allocated to that or any other final cost objective. Direct costs of the contract shall be charged directly to the contract. All costs specifically identified with other final cost objectives of the contractor are direct costs of those cost objectives and are not to be charged to the contract directly or indirectly.

(b) For reasons of practicality, the contractor may treat any direct cost of a minor dollar amount as an indirect cost if the accounting treatment –

(1) Is consistently applied to all final cost objectives; and

(2) Produces substantially the same result as treating the cost as a direct cost.

FAR 31.202.

**The Truth in Negotiation Act**

15. The Truth in Negotiation Act (TINA), 10 U.S.C. § 2306a, provides, in pertinent part:

(a) Required cost or pricing data and certification. –

(1) The head of an agency shall require offerors, contractors, and subcontractors to make cost or pricing data available as follows:

(A) An offeror for a prime contract under this chapter to be entered into using procedures other than sealed-bid procedures that is only expected to receive one bid shall be required to submit cost or pricing data before the award of a contract if –

12

> (i) in the case of a prime contract entered into after June 30, 2018, the price of the contract to the United States is expected to exceed $2,000,000; and
>
> (ii) in the case of a prime contract entered into on or before June 30, 2018, the price of the contract to the United States is expected to exceed $750,000.

(B) The contractor for a prime contract under this chapter shall be required to submit cost or pricing data before the pricing of a change or modification to the contract if –

> (i) in the case of a change or modification made to a prime contract referred to in subparagraph (A)(i), the price adjustment is expected to exceed $2,000,000;
>
> (ii) in the case of a change or modification made after July 1, 2018, to a prime contract that was entered into on or before June 30, 2018, and that has been modified pursuant to paragraph (6), the price adjustment is expected to exceed $750,000; and
>
> (iii) in the case of a change or modification not covered by clause (i) or (ii), the price adjustment is expected to exceed $750,000.

(C) An offeror for a subcontract (at any tier) of a contract under this chapter shall be required to submit cost or pricing data before the award of the subcontract if the prime contractor and each higher-tier subcontractor have been required to make available cost or pricing data under this section and –

> (i) in the case of a subcontract under a prime contract referred to in subparagraph (A)(i), the price of the subcontract is expected to exceed $2,000,000;
>
> (ii) in the case of a subcontract entered into after July 1, 2018, under a prime contract that was entered into on or before June 30, 2018, and that has been modified pursuant to paragraph (6), the price of the subcontract is expected to exceed $2,000,000; and
>
> (iii) in the case of a subcontract not covered by clause (i) or (ii), the price of the subcontract is expected to exceed $750,000.

(D) The subcontractor for a subcontract covered by subparagraph (C) shall be required to submit cost or pricing data before the pricing of a change or modification to the subcontract if –

(i) in the case of a change or modification to a subcontract referred to in subparagraph (C)(i) or (C)(ii), the price adjustment is expected to exceed $2,000,000; and

(ii) in the case of a change or modification to a subcontract referred to in subparagraph (C)(iii), the price adjustment is expected to exceed $750,000.

(2) A person required, as an offeror, contractor, or subcontractor, to submit cost or pricing data under paragraph (1) (or required by the head of the agency concerned to submit such data under subsection (c)) shall be required to certify that, to the best of the person's knowledge and belief, the cost or pricing data submitted are accurate, complete, and current.

(3) Cost or pricing data required to be submitted under paragraph (1) (or under subsection (c)), and a certification required to be submitted under paragraph (2), shall be submitted –

(A) in the case of a submission by a prime contractor (or an offeror for a prime contract), to the contracting officer for the contract (or to a designated representative of the contracting officer); or

(B) in the case of a submission by a subcontractor (or an offeror for a subcontract), to the prime contractor.

(4) Except as provided under subsection (b), this section applies to contracts entered into by the head of an agency on behalf of a foreign government.

(5) A waiver of requirements for submission of certified cost or pricing data that is granted under subsection (b)(1)(C) in the case of a contract or subcontract does not waive the requirement under paragraph (1)(C) for submission of cost or pricing data in the case of subcontracts under that contract or subcontract unless the head of the procuring activity granting the waiver determines that the requirement under that paragraph should be waived in the case of such subcontracts and justifies in writing the reasons for the determination.

(6) Upon the request of a contractor that was required to submit cost or pricing data under paragraph (1) in connection with a prime contract entered into on or before June 30, 2018, the head of the agency that

entered into such contract shall modify the contract to reflect subparagraphs (B)(ii) and (C)(ii) of paragraph (1). All such modifications shall be made without requiring consideration.

(7) Effective on October 1 of each year that is divisible by 5, each amount set forth in paragraph (1) shall be adjusted in accordance with section 1908 of title 41.

(b) Exceptions. –

(1) In general. – Submission of certified cost or pricing data shall not be required under subsection (a) in the case of a contract, a subcontract, or modification of a contract or subcontract –
(A) for which the price agreed upon is based on –

(i) adequate competition that results in at least two or more responsive and viable competing bids; or

(ii) prices set by law or regulation;

(B) for the acquisition of a commercial item;

(C) in an exceptional case when the head of the procuring activity, without delegation, determines that the requirements of this section may be waived and justifies in writing the reasons for such determination; or

(D) to the extent such data –

(i) relates to an offset agreement in connection with a contract for the sale of a weapon system or defense-related item to a foreign country or foreign firm; and

(ii) does not relate to a contract or subcontract under the offset agreement for work performed in such foreign country or by such foreign firm that is directly related to the weapon system or defense-related item being purchased under the contract.

## IV.    Allegations

### Relator Witnessed ADSI's Violations of the False Claims Act

16.     Relator worked for ADSI from March 2015 to October 2018. He was employed as a Contracts Manager at the company's office in Herndon, Virginia. During his time at ADSI, Mr.

Kmec provided contract, administrative, and analytical support for the company when responding to Government solicitation requests. Mr. Kmec also provided support during contract performance in the event of any change proposals or performance issues.

17.     By virtue of his position, Relator developed concerns regarding ADSI's estimating and account practices. During his employment, Mr. Kmec learned that ADSI frequently submitted claims to the Federal Government for payments that the company was not entitled to receive.

## The Defendants Submitted False Claims

**One-Roof Concept**

18.     Many of ADSI's contracts with the United States permit the company to bill a portion of its indirect costs (such as costs related to general and administrative overhead) to the contracting agency. The accuracy of ADSI's claims under these contracts relies on the company's proper allocation of the underlying costs.

19.     ADSI shares a Herndon, Virginia, office building with Airbus Americas. Like ADSI, Airbus Americas is a subsidiary of Airbus Group, Inc., but it provides goods and services to the commercial (i.e., non-governmental) aviation sector in the U.S.

20.     Under what the companies refer to as the "One-Roof" concept, human resources, IT, and compliance department employees nominally work for ADSI but spend most of their time supporting Airbus Americas' matters. However, ADSI allocates 100% of the costs for these resources to ADSI's indirect rates, which are then billed to the U.S. Government. Because of this practice, ADSI submitted false claims by billing the Government for work that benefits Airbus Americas' commercial projects, instead of the Government.

21.     The costs of these shared resources do not meet the allocability standard of FAR 31.201-4 ("Determining allocability") because they cannot be distributed to Government contracts in reasonable proportion to the benefits received. ADSI's lack of internal controls and failure to enforce proper timekeeping practices (e.g. audits, floor checks) make any equitable and reasonable allocation of these costs impossible. Since ADSI employees (absent directions from superiors) do not differentiate the time they spend supporting ADSI matters and those of other affiliates, the Government ultimately pays for the time that these employees spend supporting matters that have no benefit to the U.S. Government.

22.     With respect to ADSI's support of foreign affiliates on matters unrelated to ADSI's business opportunities (where the U.S. Government gets no benefit from ADSI), ADSI's executives and managers only authorize ADSI's employees to charge their time to ADSI's G&A (General and Administrative expenses) account. That account is reimbursed by the U.S. Government. ADSI employees are not directed to attribute their time to a separate charge number to distinguish their time when supporting foreign affiliated companies on matters unrelated to ADSI's business opportunities.

23.     IT support provides an example where the benefit to the Government is too indirect and unmeasurable to justify the distribution as "reasonable" and "equitable" under FAR 31.201-4. The costs of IT employees (whose time is shared between ADSI and Airbus Americas) are passed to the Government. (Those employees have also been working for ADSI's former affiliate, Hensoldt Inc., under an "IT Services" contract worth $1.78 million.) Although the Hensoldt contract should increase the base across which the costs are spread – thereby benefitting the Government – in fact, the cost distribution is neither equitable nor reasonable: a large portion of the "IT Services" project is performed at ADSI's facility, using ADSI's

equipment and personnel – all resources that are already reimbursed by the Government via indirect rates. ADSI's IT team, together with the General Counsel, Pricing Director, and Contracts Director, charged their time for the entire Phase I of the Hensoldt IT project (which included selling and marketing expenses), to a G&A account that is reimbursed by the Government. The Government will receive no benefit from any future venture related to ADSI's "IT support" because this venture is not an official Airbus business offering, and is performed exclusively by ADSI's overhead employees.

24.     Application of the One-Roof concept affected all of ADSI's incurred cost submission proposals due to inaccurate and incomplete data. It also impacted all non-commercial contracts due to inflated indirect costs.

25.     The Defendants' misrepresentations under the One-Roof concept were material to the United States' decision to pay the claims submitted by Defendants on those contracts. Had the United States understood that it was paying for resources that were expended for Defendants' commercial projects and not for the benefit of the Government, the United States would have refused to pay ADSI's claims in full or in part.

**Tetrapol Radio Contract**

26.     In early 2018, ADSI withheld from the Government its inability to fulfill a material requirement of a Government contract.

27.     ADSI was awarded a sole-source contract to perform a technology refresh on a communication system used by the United States Army. The Army's Justification and Approval (J&A) for granting the sole-source contract specifically stated that the vendor would be upgrading 497 vehicle radios (acquired from Airbus) and a number of Airbus' TPH-700 radios

with the latest encryption technology.  The J&A indicated that the upgrades could only be performed by one vendor – ADSI – due to the proprietary nature of its network. ADSI and its European affiliate (Airbus Secure Land and Communications (SLC)), however, knew in advance that the radios could not be upgraded and would need to be completely replaced with a newer model. ADSI allowed the Government to proceed as though the upgrade were possible because it knew that, without the barrier to competition, the Army would have to compete the effort among all bidders. This scheme resulted in economic waste by necessitating the replacement of radios recently acquired by the Army, and made the purchase more expensive by eliminating competition.

28.     ADSI also falsely represented to the Army that its radios and services were "commercial items" as defined in FAR 2.101. Doing so allowed ADSI to avoid certifying its cost or pricing data and kept the Army from questioning its costs or above-average profit margin (40%). ADSI asked the Army to issue a commercial items contract knowing that its product could not qualify for a commercial item exception. The exception would only be applicable if the Tetrapol network and radios were sold to State and local agencies in substantial quantities on a competitive basis. To qualify for the exception, the radios also had to be developed exclusively at private expense (under the non-developmental item exception (8) of FAR 2.1 definition of "Commercial item"). However, the Tetrapol equipment and network were funded by the French Government. Although SLC could provide evidence of the sale of the network and radios to foreign State and local agencies, it internally confirmed that the French Government had funded the initial development.

29.     In addition, ADSI was unable to determine that SLC's proposed installation services met the requirements under exception (5) of the definition of "commercial item" (calling

for such services to be procured for support of an item referred to in paragraph (1), (2), (3), or (4) of the "commercial item" definition), and could not obtain evidence that SLC provides similar services contemporaneously to the general public under terms and conditions similar to those offered to the Federal Government. ADSI also could not determine the price reasonableness of SLC's services. ADSI concealed this material fact from the Government, fraudulently claiming that the network, radios, and services qualified as commercial items.

30.     Relying on ADSI's false claim that the radios were commercial items, the Army proceeded to issue the RFP on a FAR Part 12 (Commercial Item Procurement) basis. Responding to the RFP, ADSI submitted a proposal under which its affiliate would make a 40% profit on the total sale, allowing ADSI to earn its pass-through fees and additional profit. This 40% margin was not disclosed to the Government. ADSI and SLC understood that, if the Army required ADSI to submit its proposal under FAR Part 15, ADSI and SLC would need to provide a full cost disclosure to include their profit. In that scenario, given the maturity of the product, ADSI and SLC would likely be limited to a profit of 15% or less. To avoid such an outcome, ADSI proceeded with its false "commercial item" claim so that it could conceal SLC and ADSI's profits, the number of hours required to install the network, and the presence of unallowable contingencies.

31.     ADSI knew that the Army was under time pressure to award the contract and had a budget approximating $10 million. ADSI delayed submitting its proposal to increase that pressure and the likelihood that its proposal would be accepted. Ultimately, the Army awarded the $9.3 million contract to ADSI.

32.     The Defendant's misrepresentations concerning the Tetrapol contract were material to the United States' decision to pay the claims submitted by the Defendant. Had the

United States understood that ADSI could not perform the contract in the manner described by the Government, the United States would not have awarded the contract to ADSI on a sole-source basis, and would not have paid ADSI's false claims in whole or in part.

**Mischarging Interorganizational Transfers (TRS-3D Spare Parts)**

33.     ADSI knowingly overcharged the Government for parts for the TRS-3D radar system. The Defense Logistics Agency (DLA) procures TRS-3D components from ADSI using non-commercial, sole-source contracts under FAR Part 13 (simplified acquisition) and FAR Part 15. ADSI subcontracts the manufacture, handling, and shipping of the TRS-3D parts to its affiliate, Airbus DS GmbH. Since DLA procures the parts under non-commercial contracts, FAR 31.205-26(e) requires Airbus DS GmbH to quote the parts to ADSI at cost (without fee or profit), to prevent "fee pyramiding" between divisions under common control. However, Airbus DS GmbH passes the parts to ADSI at full price, including its fee. This application of a fee-upon-fee is a violation of FAR 31.205-26(e) concerning material transfers between divisions under common control. This scheme affects every TRS-3D spare part order including orders SPRPA116CX017, SPRPA116CX016, SPRMM116CWB08, SPRMM116CYB84, SPRMM116CYA65, and SPRMM117CWA47.

34.     For orders exceeding the threshold for Certified Cost or Pricing Data ($750,000), ADSI falsifies its certificates to prevent the appearance of fee-on-fee by reducing Airbus DS GmbH's fee by an arbitrary (assumed) amount before applying ADSI's own fee. ADSI manipulates Airbus DS GmbH's prices by putting an arbitrary percentage amount in the "assumed fee" cell (G4) on the TRS Radar Pricing Matrices workbook. Airbus DS GmbH's price is then automatically recalculated to appear as though it was bid to ADSI without a fee. The real

fee, however, is hidden from the Government. This arbitrary reduction in the affiliate's fee is completed, ostensibly to comply with FAR 31.205-206(e) by hiding the real fee or profit earned by Airbus DS GmbH. Thus, ADSI knowingly provides incomplete and inaccurate cost data, violating TINA, and violating the False Claims Act under a defective pricing theory. Certified Cost or Pricing Data were required under TRS-3D orders No. SPRAI-16-C-X020, SPRPA1-14-C-X015, and SPRAI-16-C-X019.

35.     When quoting DLA, ADSI further pads the prices by adding two hours of program management and one hour of contract management time for each part, and adds $400 of "custom fees" for each part before applying its full G&A rate and adding a fee. The addition of hours for the Program Manager and Contract Manager are added for each part quoted to DLA, without regard to any historical or engineering estimates, and with the knowledge that ADSI would be bundling multiple DLA orders (sometimes by a dozen) into a single subcontract order to be processed by ADSI's junior purchasing agent at a much lower labor rate than that of the Contracts Manager. In addition, ADSI's G&A rate already includes the cost of "material handling," resulting in double counting once the G&A has been applied. Consequently, ADSI inflates the cost of some parts, ordered from Germany, by over 500% even though ADSI does not manufacture, handle, ship, or meaningfully coordinate the delivery.

36.     ADSI knows that its pricing practices result in significant overcharging for the spare parts sold to the Government. To hide this fact, it devised another scheme under which it conceals the premium it charges on top of affiliates' prices by knowingly failing to report the value of its subcontracted orders in accordance with FAR 52.204-10.

37.     The Defendant's misrepresentations concerning the TRS-3D purchase orders were material to the United States' decision to pay claims submitted by Defendants. Had the United

States understood that Defendants were overcharging the Government while concealing and manipulating pricing data, the United States would have refused to pay ADSI's claims in full or in part.

**ADSI Regularly Fabricates its Approved G&A Rates and Pads its Prices with Arbitrary Hours.**

38.     ADSI executives devised a scheme that shifts the allocation of some full indirect costs to sole-source contracts, thereby reducing indirect rates on competitive bids or on proposals where ADSI's price must fit within the customer's budget. Company executives did so knowing that the full rate would be applied to sole-source contracts or subcontracts with other prime contractors, or would be hidden within FAR Part 12 (commercial item) contracts.

39.     The inequitable allocation of G&A impacts both CAS and non-CAS covered contracts, resulting in overestimation of costs on Firm Fixed Price (FFP) contracts and causes the submission of false claims under flexibly priced contracts. Additionally, ADSI does not accumulate its costs consistent with its pricing estimates, violating CAS 402. The Government ultimately pays more, since fewer costs are accumulated on FFP contracts and subcontracts because non-compliant practices were used to calculate cost estimates.

40.     Moreover, the company does not consistently apply its Defense Contract Auditing Agency (DCAA)-approved G&A rate, or the rates disclosed in its incurred cost proposal submission. Instead, when bidding on U.S. Government contracts, ADSI fabricates a G&A rate without providing any disclosures or cost impact analysis to DCAA, and without any attempts to revise its disclosed accounting practices. This inequitable allocation causes significant distortions in ADSI's allocated G&A rate. In addition, ADSI has deviated from its disclosed accounting practices by creating an "Orlando factor," a special pool and rate to collect costs resulting from

the sale of its Electronics division (now Hensoldt, Inc.) which the company applies to its proposals without revising its disclosed accounting practices.

41.     In addition, to increase ADSI's billable time, the company routinely overestimates the number of hours for the program management staff (referred to as the Program Management Office (PMO)) under sole-source contracts with the U.S. Government or its prime contractors. These estimates of hours are neither based on any historical data nor any engineering estimate of time required to perform a task; rather, the estimates are purely arbitrary, developed by unreasonably inflating the number of non-value-added support hours. In some instances, the cumulative hours proposed for the same employee across all contracts exceed the number of available work hours in a calendar year (e.g., 1920 hours). Due to a lack of timekeeping enforcements and proper estimating practices, Program Managers routinely charge their time to whichever project has billable time left, and not necessarily to the projects they have been supporting. Such practices prevent ADSI from collecting accurate historical data to be used for estimating cost on future follow-on efforts (rendering claims for those "defectively priced" Government contracts false).

42.     The Defendants' manipulation of G&A rates was material to the United States' decision to pay claims submitted by the Defendants. Had the United States understood that ADSI fabricated its G&A rates and padded its prices with arbitrary hours, the United States would have withheld payment in full or in part for ADSI's false claims, or would have declined to award the contract to ADSI outright.

**Pricing of Unallowable and Undisclosed Contingency Factors**

43.     As a policy, ADSI's European affiliates apply unallowable risk contingency

factors to each pricing proposal submitted to ADSI, including those subject to TINA. While the

affiliates disclose the contingencies to ADSI, ADSI does not disclose the cost or nature of these

contingencies to the Government or its prime contractors. This illegal practice results in an

uneven playing field, where the Government is unknowingly overcharged on a given contract

because it pays a large premium for undisclosed contingencies in advance and irrespective of

whether they are reasonable and necessary. Thus, unreasonable technical and financial

contingencies such as the risk of "bad performance," risk of paying for liquidated damages, or

risk of violating TINA, are priced into proposals in advance and without any disclosure to the

Government.

44.     This practice is especially damaging to the Government in sole-source

procurements subject to TINA. Since ADSI's affiliates compute these contingencies as a

percentage of the total price and then hide them in the total price of materials and labor, the

Government is unable to assess the reasonableness of their cost and speculative nature.

45.     This practice was demonstrated with the $8.4 million proposal that ADSI

submitted to Lockheed Martin for the TRS-4D radar "Sailfish" program. There, ADSI certified

that its data was current and complete as part of its Certificate of Current Cost or Pricing Data.

Since the factoring of contingencies is a matter of ADSI's European affiliates' pricing policy,

and since ADSI exclusively subcontracts its work to Airbus' affiliates (Airbus DS GmbH for the

Sailfish proposal), every proposal that ADSI has submitted to the Government or to its prime

contractors contains these impermissible, hidden contingencies.

46.     The Defendants' failure to disclose the inclusion of unallowable risk contingency factors was material to the United States' decision to pay the claims submitted by Defendants on various sole-source procurement contracts. Had the United States understood that ADSI's claims included charges associated with unallowable risk contingency factors, the United States would have refused to pay ADSI's claims in full or in part.

**Phony Helpdesk Support**

47.     Contract No. HSCG79-15-C-PC7019 is a firm fixed price contract funded by the United States Coast Guard (USCG) for Radar Sustainment and Maintenance Support Services. The $4.2 million contract, subject to CAS, was awarded to ADSI on June 26, 2015. Pursuant to its proposal, ADSI agreed to provide a helpdesk hotline to support the USCG as it operated the AN/SPS 75 Radar system.

48.     In reality, the hotline consisted of an unmanned phone installed on an empty desk with a sign stating "USCG hotline, Please do not Touch!" The purported hotline merely forwarded calls to an ADSI engineer whose time was already factored into the proposal.

49.     In its proposal to the USCG, ADSI identified and priced hours for performing helpdesk support as a separate cost objective, even though ADSI knew in advance that the helpdesk would not be physically attended (because calls would be rerouted to an ADSI engineer). This practice resulted in double-counting because the responding engineer's time was already accounted for under another cost objective in the proposal.

50.     ADSI violated CAS 401, Consistency in Estimating, Accumulating, and Reporting Cost because its estimation of the hours required for helpdesk support did not match the accumulation of actual cost during the performance of the contract.

51.     ADSI also violated CAS 402 by pricing hours for the Contracts Manager even though ADSI already charges contract support costs indirectly in like circumstances (i.e., in situations where the charge cannot be allocated to a single cost objective). This practice of adding contract hours also conflicts with ADSI's Disclosure Statement, dated April 5, 2010, which states that "[w]hen multiple contracts are managed and administered as a group in a business unit, the related cost is charged to overhead. The administrative costs of the home office contracts department are charged to G&A." Since the cost of contract administration is already factored in a separate cost pool, the addition of direct-billable hours results in double-counting where each type of cost is allocated more than once and on multiple bases to the contract. ADSI's overestimation of hours impacts both CAS and non-CAS covered Firm Fixed Price orders because it causes the Government to pay a higher price when fewer costs are accumulated on the contract because of a cost estimate formed using non-compliant practices.

52.     The Relator is informed and believes, and based upon such information and belief alleges, that the Defendants' double-billing and failure to comply with CAS while performing the support services contract were material to the United States' decision to pay the claims submitted by Defendants on that contract. Had the United States understood that hours were being double-counted and that Defendants were failing to adhere to required standards, the United States would have refused to pay ADSI's claim in full or in part.

### The Defendant Retaliated Against the Relator

53.     When ADSI management learned that Mr. Kmec knew of their fraudulent activities and maintained documentation to support his impending whistleblower suit, the company acted to silence him. ADSI made efforts to humiliate, distress, and discredit Mr. Kmec, and constructively terminated him from his position in October 2018.

54.     Early on in his work at ADSI, the Relator developed concerns about the company's billing and contracting practices (including those enumerated above, and others). However, the Relator did not keep his concerns for ADSI's business practices a secret. Instead, he disclosed the fraudulent activity to ADSI management on multiple occasions, informing his manager, ADSI's Pricing Director, and General Counsel. To his disappointment, the company did nothing to address the wrongdoing, and Mr. Kmec became the target of bullying from his superiors.

55.     In May 2017, Mr. Kmec questioned shoddy estimating practices committed by the Director of the MILDS program.

56.     In August 2017, he questioned his superiors whether ADSI's payment for the lavish dinners to obtain favorable treatment by its prime contractor might have violated the Anti-Kickback Act.

57.     In December 2017, Mr. Kmec voiced his concerns over the allocability of the Hensoldt IT contract to Jack Clumpkens, ADSI's Pricing Director.

58.     Mr. Kmec categorized and summarized these issues in a letter to ADSI's president. Unfortunately, then-President Mike Consentino announced his resignation in early 2018 and Mr. Kmec was reluctant to trust anyone else with the letter.

59.     In June 2018, he made several disclosures to ADSI's General Counsel, questioning the lack of evidence to support a commercial item determination on the Tetrapol contract.

60.     In September 2018, Mr. Kmec showed the letter (originally intended for Mike Consentino), and its allegations to ADSI's Pricing Director, Jack Clumpkens. In addition Mr. Kmec voiced his concerns over the Hensoldt Inc. "IT Support" contract and the overall sharing

of resources among affiliates. Mr. Clumpkens then made his own disclosure to Charles Broome, ADSI's acting CEO.

61.     Around that same time, Mr. Kmec refused to sign a fake contract as his superior, Gregory Angst, demanded. Mr. Angst ordered Mr. Kmec to provide his signature on a university's contract so that a new ADSI program manager could maintain a Top Secret clearance.

62.     Shortly thereafter, Mr. Kmec discovered that Mr. Angst had created a job requisition for Mr. Kmec's existing position. Approximately one week later, Mr. Kmec learned that ADSI had launched an investigation targeting him. ADSI discovered that Mr. Kmec had preserved emails and contemporaneous evidence of ADSI's fraudulent behavior (by sending this information to his personal email account and storing it on a personal hard drive). During its investigation, ADSI found additional emails with evidence incriminating the company, which Mr. Kmec kept in two folders on his work computer in his MS Outlook Agent. Unknown ADSI employees then deleted the contents of those folders, as Mr. Kmec later discovered.

63.     On October 17, 2018, ADSI IT and security staff accused Mr. Kmec of using his personal drive at work and demanded that he turn it over for inspection (under the false pretext that they had detected a virus on it). Mr. Kmec refused, and under duress, resigned from the company.

64.     ADSI subsequently contacted federal law enforcement, falsely alleging that Mr. Kmec misappropriated ADSI's documents in violation of the Trade Secrets Act, 18 U.S.C. § 1832. Based on ASDI's complaint, FBI agents raided Mr. Kmec's residence two weeks later, taking his personal drive and laptop.

65.     Defendants' response to the Relator's whistleblower activities constitutes a violation of the anti-retaliation provision of the False Claims Act (31 U.S.C. § 3730(h)), the Defense Contractor Whistleblower Protection Act (10 U.S.C. § 2409), and 41 U.S.C. § 4712.

### Causes of Action

### COUNT I – SUBMISSION OF FALSE CLAIMS
### FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§ 3729(a)(1)(A), *et seq.*

66.     Relator repeats each and every allegation of the preceding paragraphs of this Complaint with the same force and effect as if set forth herein.

67.     As a result of the foregoing conduct, Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

68.     These materially false claims overcharged the United States.

69.     Defendants acted with actual knowledge, deliberate ignorance, or reckless disregard of the false or fraudulent nature of their claims.

70.     Because of the Defendants' actions, the United States has been damaged in a substantial amount to be determined at trial.

### COUNT II – USE OF FALSE RECORDS
### FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§ 3729(a)(1)(B), *et seq.*

71.     Relator repeats each and every allegation of the preceding paragraphs of this Complaint with the same force and effect as if set forth herein.

72.     As a result of the foregoing conduct, Defendants knowingly made and used false records and statements, including, but not limited to, false cost and pricing information submitted

in response to Government contract solicitations and/or kept on the Defendants' books and records, to get false or fraudulent claims paid or approved, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

73.     These false records were material to false claims, because they had a natural tendency to influence and were capable of influencing the Government to enter into contracts and to make payments which, absent their falsity, the Government would not have done.

74.     Defendants acted with actual knowledge, deliberate ignorance, or reckless disregard of the false or fraudulent nature of their claims.

75.     Because of the Defendants' actions, the United States has been damaged in a substantial amount to be determined at trial.

## COUNT III – RETALIATION IN VIOLATION OF 31 U.S.C. § 3730(h)

76.     Relator undertook lawful acts in furtherance of an action under the False Claims Act, 31 U.S.C. § 3729, *et seq.* Relator also undertook efforts to stop the Defendants from violating the False Claims Act, 31 U.S.C. § 3729, *et seq.*

77.     Defendant ADSI was aware of Relator's efforts as described in the preceding paragraph.

78.     Defendant ADSI retaliated against Relator within the meaning of the False Claims Act, 31 U.S.C. § 3730(h)(1).

79.     Because of Defendant ADSI's actions, Relator has been damaged in a substantial amount to be determined at trial.

## JURY TRIAL DEMAND

80. Relator and Plaintiff, Maros Kmec demands a jury trial on all Counts.


## PRAYER FOR RELIEF

WHEREFORE, in Mr. Kmec's capacity as Relator, he prays that the Court enter

judgment against Defendants as follows:

(a) that the United States be awarded damages in the amount of three times the damages

sustained by the United States because of the false claims alleged within this Complaint,

as the Federal False Claims Act, 31 U.S.C. § 3729, *et seq.*, provides;

(b) that civil penalties be imposed for each and every false claim that Defendants caused to

be presented to the United States and/or its grantees, and for each false record or

statement that Defendants made, used, or caused to be made or used that was material to

a false or fraudulent claim;

(c) that attorneys' fees, costs, and expenses that the Relator necessarily incurred in bringing

and pressing this case be awarded;

(d) that the Relator be awarded the maximum amount allowed to him pursuant to the False

Claims Act; and

(e) that this Court award such other and further relief as it deems proper.


FURTHERMORE: WHEREFORE, in Mr. Kmec's capacity as Plaintiff, he prays that the Court

enter judgment against Defendants as follows:

(a) that he be awarded all remedies that the Federal False Claims Act, 31 U.S.C. § 3730(h)

provides, including "reinstatement with the same seniority status that employee,

32

contractor, or agent would have had but for the discrimination, two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination"; and

(b) that attorneys' fees, costs, and expenses that the Plaintiff necessarily incurred in bringing and pressing this case be awarded; and

(c) that this Court award such other and further relief as it deems proper.

Respectfully submitted,

Timothy R. Clinton (Va. Bar No. 70902)
CLINTON & PEED
777 6th Street NW, 11th Fl.
Washington, DC 20001
(202) 621-1828
(202) 204-6320 (fax)
tim@clintonpeed.com

Benjamin J. Vernia*
D.C. Bar No. 441287
Andrew K. Murray*
D.C. Bar No. 187281
THE VERNIA LAW FIRM
1455 Pennsylvania Ave., N.W.,
Suite 400
Washington, D.C. 20004
Tel. (202) 349-4053
Fax (866) 572-6728
bvernia@vernialaw.com

*pro hac vice motion to be filed*

COUNSEL FOR RELATOR AND PLAINTIFF,
Maros Kmec

Date: May 28, 2019

## Certificate of Service

I hereby certify that a copy of the foregoing Complaint, filed under seal pursuant to 31 U.S.C. § 3730, was served on the following:

Hon. William Barr
Attorney General
  of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530-0001

Hon. G. Zachary Terwilliger
United States Attorney
  for the Eastern District
  of Virginia
Justin W. Williams United States
    Attorney's Building
2100 Jamieson Ave
Alexandria, VA 22314

Timothy R. Clinton

COUNSEL FOR RELATOR AND
PLAINTIFF,
Maros Kmec